[L. A. No. 29880. In Bank. Oct. 27, 1972.]

Estate of STEPHEN BIELEC, Deceased.
HOUSTON I. FLOURNOY, as State Controller,
Petitioner and Respondent, v.
PAUL BIELEC, Individually and as Executor, etc.,
Objector and Appellant.

214

## Counsel

Abrams & Fox and Harry D. Fox for Objector and Appellant.

Myron Siedorf, Walter H. Miller and Edwin Rosenthal for Petitioner and Respondent.

## Opinion

**WRIGHT, C. J.**—Paul Bielec, individually and as executor of the will of his deceased brother Stephen, appeals from an order overruling objections to the inheritance tax appraiser's report[1] and fixing the inheritance tax for Stephen's estate.

Ten years before Stephen died, he, Paul and a corporation wholly owned by them entered into an agreement which provided that the corporate stock of the brother who was first to die would be sold back to the corporation for either $100,000 or some other amount to be set by the parties in the interim.[2] ■■ ■■■■ At the time of Stephen's death the fair market value of his stock was $454,127.[3] The inheritance tax appraiser computed

---

[1] The proceedings with which we are here concerned were had before the State Controller's "appraisers" became "referees." (See Prob. Code, § 605 et seq., and Rev. & Tax. Code, § 14501 et seq., as amended in 1970, operative July 1, 1971.)

[2] The "corporate stock" actually consisted of stocks of multiple corporations wholly owned by Stephen and Paul. One of such corporations contracted to purchase the deceased's brother's share in all such corporations. For our purposes we need not recognize the corporate entities as separate from each other, and we treat the agreement as if a single corporation was involved.

[3] At the hearing on the objections to his report the appraiser testified that "[O]ur regulations require that a closely-held corporation be examined as to its financial statements for the preceding three to five years, for us to be furnished a detailed list of the real assets held within the corporation and for us to place market values, reasonable market values, on the so-called underlying assets. Now, two of these three corporations had substantial holdings in real properties that had been acquired, in most instances, several or more years prior to the date of death. . . . There was also a manufacturing complex and a shopping center involved, all of which, it is my understanding, had been acquired subsequent to the date of the agreement and prior to the date of death. . . . In none of these appraisals [of the market values of

and the court fixed the tax on the basis of that value. Paul, as executor and principal beneficiary of Stephen's will, contends that the buy-sell agreement conclusively established $100,000 as the value of the stock for inheritance tax purposes and that the execution of the agreement did not result in a taxable transfer. For the reasons hereafter stated we reject Paul's contentions and affirm the court's order.

Beginning in 1946 Stephen and Paul founded, operated and built up various businesses. In 1956 and until Stephen's death in 1966 he and Paul each owned half the corporate shares representing the equity interests of such businesses. On July 20, 1956, Stephen, Paul and the corporation (through Stephen, its president, and Paul, its secretary) entered into a written agreement which recited the ownership of the stock and the parties' "desire to provide for the purchase, by the CORPORATION . . . of all the above mentioned shares of the natural party first to die." The contract provided that "In the case of the death of the natural party to this agreement first to die, the CORPORATION will purchase and the executor or administrator of the estate of the natural party first to die will sell the deceased party's shares . . . for" the amount of $100,000.

". . . STEVE and PAUL will, on or about the 1st day of each year, re-evaluate the above mentioned selling price of the shares . . . and shall place the value of the selling price of said shares in said corporations on the sheet of paper attached hereto and marked 'Exhibit "A".' "

There is no dispute and the court so found that when the brothers entered into the contract the agreed selling price for the shares was fair and reasonable. During the ten-year period prior to Stephen's death the two brothers did not re-evaluate the price fixed by the agreement. ■ The court also found on substantial evidence that notwithstanding the agreement the brothers "were free to convey their respective interests during lifetime and the agreement was only effective if the parties had not done so at the time of death of one of the natural persons."[4] As so con-

---

Stephen's stock in the corporation] did I assess anything for good will. The reason for my increased values rests entirely in the inflated values of the property held."

Without considering at this time the effect of the buy-sell agreement, we conclude that the appraiser's method of valuing these untraded, closely held shares was proper. (See *Estate of Felton* (1917) 176 Cal. 663, 668 [169 P. 392]; *Estate of Rowell* (1955) 132 Cal.App.2d 421, 428-429 [282 P.2d 163]; Cal.Admin. Code, tit. 18, ch. 2.5, subch. 1, reg. 13951(g).)

[4]Paul disputes the propriety of the finding. The agreement itself contained no provision restricting an *inter vivos* sale by either brother and the court was not required to accept self-serving testimony by Paul and his attorney that there was a collateral oral agreement which might have limited such a sale.

ceived the *inter vivos* agreement transferred to each brother a contingent interest in the stock of the other. This interest consisted of the right to require that those shares still owned by a deceased brother at the time of his death be sold to the corporation for the price last agreed upon by the brothers. Apart from this contingent interest each brother retained during his lifetime full possession and absolute control and enjoyment of his stock including the right to dispose of it to third parties.

On April 6, 1966, when Stephen was 39 years old he was killed in an airplane crash. His will, executed on September 28, 1965, left most of his property to Paul as residuary beneficiary and named him executor. After Paul qualified as executor he obtained an order authorizing the sale of the shares which had been Stephen's to the corporation for the price fixed in the buy-sell agreement. The Controller was not made a party to nor did he participate in those proceedings.

The court, in overruling Paul's objections to the appraiser's report, was of the opinion that the Controller could ignore for tax purposes the effect of the buy-sell agreement and treat the shares as if they were to be distributed from the estate to Paul. Although the estate was committed to sell the shares to the corporation and acquired in exchange $100,000 which appeared in the inventory as an asset of the estate, an additional $354,127 was deemed to have accrued to Paul as a transfer subject to tax. The corporation, of course, acquired a $354,127 advantage when it purchased Stephen's $454,127 asset for $100,000 and this full advantage accrued to Paul when the purchase simultaneously vested him as the sole owner of all of the outstanding shares of the corporation. ██ █ The character of the transfer thus made is the principal issue before us.[5]

The courts of this state have heretofore been called upon to determine the tax consequences of *inter vivos* arrangements which require that upon

---

[5]"The Inheritance Tax Act reaches transfers by instruments which are nontestamentary, as well as those which arise by will, . . . [F]or purposes of fixing the inheritance tax beneficial succession is the measure. For such purposes we are of the view that the court may consider agreements extrinsic to the will which limit the absolute estate devised by will." (*Estate of Rath* (1937) 10 Cal.2d 399, 405-406 [75 P.2d 509, 115 A.L.R. 836]; see also *Kirkwood* v. *Bank of America* (1954) 43 Cal.2d 333, 338-339 [273 P.2d 532].)

We have no difficulty for purposes of the transaction before us, in recognizing that there is such a unity of interest and ownership that the separateness of Paul and the corporation ceased. We may look through a corporation to its *alter ego* if the preservation of the corporate fiction of a distinct entity would have an inequitable result or promote injustice. We have heretofore applied the *alter ego* doctrine to prevent use of the corporate form to circumvent the effect of a tax statute. (*H. A. S. Loan Service, Inc.* v. *McColgan* (1943) 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349]; *People* v. *Clauson* (1964) 231 Cal.App.2d 374, 379 [41 Cal.Rptr. 691].)

the death of a contracting party certain of his assets be transferred as provided by agreement. ■ The Legislature, in seeking to counter the avoidance of the inheritance tax through arrangements which by design or otherwise would substitute such a transfer for a testamentary disposition, has subjected to the tax those *inter vivos* transfers by which the transferor retains significant incidents of ownership while he is still alive and for which less than adequate and full consideration is given. (*Estate of Vai* (1966) 65 Cal.2d 144, 154 [52 Cal.Rptr. 705, 417 P.2d 161]; *Estate of Madison* (1945) 26 Cal.2d 453, 457-458 [159 P.2d 630].) Revenue and Taxation Code section 13643[6] provides that a transfer which conforms to section 13641 and is "made with the intention that it take effect in possession and enjoyment at or after the death of the transferor," is a transfer subject to the inheritance tax. Section 13641[7] concerns transfers for which "an adequate and full consideration in money or money's worth" was not exchanged.

In subjecting the transfer of shares to the inheritance tax in accordance with the foregoing statutory provisions the court in the instant case was necessarily required to inferentially conclude that the transfer was (1) intended to take effect in possession and enjoyment at or after death, and (2) was for less than an adequate and full consideration. It is irrefragable that the brothers intended that possession and enjoyment of the shares be withheld until death of the first to die because only upon the happening of that event could there be any shares which could be subjected to the buy-sell agreement. The first conclusion of the court is thus supported by substantial evidence and we address ourselves to the more critical second conclusion.

Resolution of the issue of whether the transfer of Stephen's shares was for an adequate and full consideration requires an evaluation of two findings of the court.[8] ■ ■■■ Each has been the source of consid-

---

[6]All references are to sections of the Revenue and Taxation Code unless otherwise specified.

[7]Section 13641 at the time of Stephen's death provided that "If a transfer specified in this article is made during lifetime by a resident, or is made during lifetime by a nonresident of property within this State, for a consideration in money or money's worth, but the transfer is not a bona fide sale for an adequate and full consideration in money, or money's worth, the amount of the transfer subject to this part shall be the excess of (a) The value, at the date of the transferor's death, of the property transferred, over (b) An amount equal to the same proportion of the value, at the time of the transferor's death, of the property transferred which the consideration received in money or money's worth for the property transferred bears to the value, at the date of transfer, of the property transferred." (Stats. 1959, ch. 485, § 1, p. 2419.)

[8]At the time the agreement was entered into (1956) transfers were subjected to section 13641 if they were for less than "a valuable and adequate consideration,"

erable confusion and together constitute the bases upon which Paul urges that the consideration of $100,000 was adequate because the estate was contractually bound and ordered by the court to sell at that price.[9]

■ Paul first relies on a finding "that at the time the written buy-and-sell contract was entered into on July 20, 1956, . . . there was adequate and full consideration for the contract." Properly interpreted this finding supports a conclusion that the *inter vivos* agreement was enforceable as between the parties to it.[10] It does not, however, lend any support to Paul's argument that there was adequate consideration for the purpose of determining the taxability of the *inter vivos* transfer. ■ The concept of adequate consideration as it is used in the Revenue and Taxation Code provisions has a meaning quite distinct from that of the same term as it is used in the laws of contract. If we were to overlook the difference and employ the term interchangeably, as Paul suggests, the entire purpose of the legislative policy would be thwarted.

Consideration adequate to create a binding contract is defined as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, . . ." (Civ. Code, § 1605.) To be adequate under the

which was defined as "a consideration equal in money or money's worth to the full value of the property transferred." (Stats. 1943, ch. 658, § 1, p. 2302.) In 1966 when Stephen died and possession and enjoyment of the transfer was realized, the statute provided for "an adequate and full consideration in money or money's worth." (Stats. 1959, ch. 485, § 1, p. 2419.) Although we do not construe these statutory provisions as requiring different tests for the applicability of section 13641 we do conclude *infra* that the applicable statute is that which is effective on the date the transfer was effected.

[9]Although Paul purports to rely on the court's ex parte order authorizing the sale as fixing the adequacy of the consideration, such reliance is unwarranted. The order also authorized the sale to Paul of stock in two other corporations for $1 each pursuant to two other buy-sell agreements not here in issue. The market value of Stephen's shares in those corporations was appraised at $17,500 and $26,762. Paul does not question the propriety of the levy of the inheritance tax based on these appraisals. Moreover, the order authorizing the sale did not purport to adjudicate the status of any person or property (see *Estate of Clarke* (1967) 66 Cal.2d 142, 145-146 [56 Cal.Rptr. 897, 424 P.2d 337]) or the beneficial interest which passed to Paul under the agreement and will. It is thus not binding on the Controller in these proceedings. (See *Estate of Morse* (1970) 9 Cal.App.3d 411, 414 [88 Cal. Rptr. 52].)

[10]The "finding" in any event, is not a finding but a conclusion of law which must be supported by findings of specific facts. (*Estate of Craycroft* (1961) 191 Cal. App.2d 436, 444 [12 Cal.Rptr. 552]; *Miller* v. *Gusta* (1929) 103 Cal.App. 32, 35-37 [283 P. 946].) The conclusion is not supported by specific findings and we are not bound thereby.

taxing statute consideration must be equivalent in value to the full value of that for which it is exchanged. If it is less than equal it or a portion thereof is subjected to imposition of a tax. (Rev. & Tax. Code, § 13641.) Contrariwise, bargained-for contractual consideration is not required to be adequate in the sense of equality in value but only need represent some legal detriment not otherwise incurred. Thus section 13641 compels an application of standards considerably more stringent than those associated with a determination of contractual enforceability. (*Estate of Craycroft, supra,* 191 Cal.App.2d 436, 444-445.) We have heretofore held and now adhere to the rule that a transfer may be deemed to have been made for an adequate and full consideration only when it is sufficient to support a demand for specific performance. (*Estate of Brix* (1919) 181 Cal. 667, 674-675 [186 P. 135].)[11]

Paul next relies on a finding that the full market value of the stock at the time the buy-sell agreement was entered into was $100,000. He urges, apart from his previous contention, that the $100,000 amount as provided in the agreement constituted adequate consideration for the purchase of the shares as that term is defined in section 13641. We would not dispute Paul's contention had there been an effective transfer of assets at the time of the buy-sell agreement, but this is not the case before us. Ignoring the fundamental thrust of section 13641 and misinterpreting the primary objective sought by levying inheritance taxes upon certain *inter vivos* transfers, Paul's argument overlooks the real substance of the transfer in the present case.

It is the intent of section 13641 and those sections incorporating its provisions to encompass within their terms those transfers which are donative in nature. They represent a legislative scheme to prevent inheritance tax evasion by imposing on the courts an obligation to "closely scrutinize the transaction in light of the expressly declared intention of the statute 'to tax every transfer made in lieu of or to avoid the passing of

---

[11]*Brix* quotes (181 Cal. at p. 675) the following from *Schader* v. *White* (1916) 173 Cal. 441, 446 [160 P. 557], as to the adequacy of consideration for purposes of specific performance: "Adequacy of price does not mean equality of price. An adequate consideration does not mean a consideration measuring to the fullest extent up to the value of the property. Each case must rest for determination upon its own facts, and equity will find adequacy or inadequacy after considering all of the circumstances appearing in each particular case."

In reaching its holding that the rule applicable in specific performance cases is to be applied in determining the adequacy of consideration for purposes of section 13641, this court in *Brix* considered statutory language which defined " 'valuable and adequate consideration' " as being " 'equal in money or in money's worth to the full value of the property transferred' " and concluded that the statutory language served "but to clarify without changing the pre-existing law." (181 Cal. at p. 674.)

property by will or the laws of succession.' " (*Estate of Craycroft, supra,* 191 Cal.App.2d at p. 445.) When the consideration paid for a transfer of property to take effect in possession and enjoyment only at death is inadequate in value as compared to the value received in exchange, the excess is tantamount to a testamentary gift and the transfer is one which conforms to section 13641. (*Estate of Stevens* (1958) 163 Cal.App.2d 255, 268-269 [329 P.2d 337].) As will be seen, the determinative question is the adequacy of the consideration at the time when the property has been effectively committed to the purposes of the *inter vivos* agreement.

In *Estate of Sisk* (1969) 269 Cal.App.2d 823 [75 Cal.Rptr. 549], in a case similar in material respects with the present one, a father breached an agreement, entered into with his wife who predeceased him, to make testamentary provision for their daughter. She successfully imposed a constructive trust upon a testamentary trustee designated in the father's will. (See *Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, 524-525 [106 P.2d 879].) She then claimed that because the transfer thereby made to her was in satisfaction of an obligation owed by her father and paid for by her mother, the transfer to her was for an adequate consideration and was not taxable. The court concluded, however, that the father had no obligation to preserve any of the estate for the daughter; that, had he chosen so to do, he could have dissipated the estate in its entirety during his lifetime; that only to the extent of the estate he retained was he estopped from making disposition to anyone other than his daughter; that the gift (the "conditional gift" arising out of the lifetime agreement with his wife) was intended to take effect in possession and enjoyment at his death; and that the gift was taxable as an *inter vivos* transfer without consideration.' Although the father's covenant was given in exchange for the mother's identical covenant and thus was supported by contractual consideration, the making of such a bilateral agreement did not constitute within the meaning of section 13641 adequate and full consideration for the transfer, if any, to be made to the daughter at the time of the death of the survivor of the contracting parents.

The court in *Sisk* distinguished *Estate of Vai, supra.* In that case a father's obligation to support his daughter arose out of an agreement with his wife whereby she had surrendered valuable consideration in exchange for the father's covenant to support his daughter both during his lifetime and should the daughter outlive him, thereafter. The daughter was thus cast in the role of a creditor of her father's estate, entitling her to enforce such a claim had the will not provided for a distribution in payment of the obligation. To the extent that the distribution in her behalf constituted payment of a firm obligation of the estate, it was not a taxable transfer.

We deal here with a *Sisk* and not a *Vai* situation. The contracting parties exchanged covenants requiring nothing more than the transfer of assets predicated upon the death of one of the parties. As in *Sisk* no separate consideration was given for the transfer to be made at death and that transfer was contingent on the transferor's possession of his property at death with no obligation on his part to refrain from dissipating any or all of such property during his lifetime. Contrary to the situation in *Vai* there existed a mere promise to perform at death if the shares were owned on that date (see also *Estate of Brix, supra,* 181 Cal. 667), and Paul could not have asserted any creditor's claim or other right against the estate had Stephen elected not to retain his shares during his lifetime.

In *Sisk* the full value of the property transferred at death, when measured at death, was subjected to the tax. Paul's most basic contention is that the date of evaluation is properly the date upon which the brothers entered into the buy-sell agreement and on that date the promised consideration for the shares satisfied statutory requirements. There is language in *Estate of Craycroft, supra,* 191 Cal.App.2d 436, a case cited on numerous occasions by both parties, which appears on the surface to support such contention.[12] An examination of that case in context with *Sisk*, however, compels a rejection of the contention.

In *Craycroft* a partnership agreement between an elderly mother, her son and daughter provided that the partnership interest of a deceased partner, the mother in this case, would be purchased by the surviving partners in consideration for an amount determined by the book or acquisition value rather than the market value of partnership assets. The Controller assessed the partnership interest in accordance with the market values of the partnership's assets, but the court in probate confined the value of the taxable transfer in accordance with the agreement. The situation thus presented was not unlike that in the instant case in superficial respects—an agreement between family members by which assets of substantial value would, on the death of one of the contracting parties, be transferred in possession and enjoyment to natural heirs in exchange for a consideration of less than fair market value at that time. On appeal the court concluded that the *inter vivos* transfer was one which would give "rise to inheritance tax liability if made without a valuable and adequate consideration." (191 Cal.App.2d at p. 444.)

---

[12]"The adequacy of consideration for an *inter vivos* transfer [to take effect in possession and enjoyment at death] is determined as of the date the transaction effecting that transfer occurs; when the transfer is effected by a written instrument the consideration is determined as of the date of the execution of that instrument. (*Estate of Stevens, supra,* 163 Cal.App.2d 255, 266.)" (191 Cal.App.2d at p. 445.)

The *Craycroft* court set forth in detail those factors which might be considered in determining the adequacy of consideration, determined that they would support a conclusion of inadequacy of consideration in that case and reversed the judgment.[13]

As noted, a significant holding in *Craycroft* deals with the time when the adequacy of consideration is to be measured. The transfer of which the court speaks in that case, however (see fn. 12, *supra*) occurred on the date of the partnership agreement. On that date the partners transferred stocks and bonds to the partnership under an agreement by which the children could acquire the mother's partnership interest at her death by a payment of the book value of the securities transferred by her. The court reasoned that if "the promise of the children to pay a fixed amount [the book value of the mother's interest in the partnership] to their mother's estate in consideration of her transfer to them of property [the mother's actual interest in the partnership] to vest in possession and enjoyment upon her death, was equal in money or money's worth to the actual value of that property at the time the promise was made" then the transfer did not fall within section 13641. (191 Cal.App.2d at p. 446.)

There are significant differences in the instant situation which preclude a like statement of the issue confronting us. *Craycroft* states that the day for determining the adequacy of consideration is the "date the transaction effecting that transfer occurs." As previously stated the mother transferred securities on the date of the partnership agreement, which agreement provided for and effected such an immediate transfer. From that moment on the mother's interest was *committed* to sale in exchange for a consideration the adequacy of which must then be measured. As heretofore noted, the making of the agreement in the present case incurred no firm obligation to transfer shares or to pay for them at Stephen's death. Only a right which was contingent upon Stephen's possessing shares at his death was vested in the corporation at the time the agreement was entered into. Since the shares

---

[13]The court stated: "The inquiry thus imposed involves a consideration of many factors, including the prospective time between transfer and death; the relationship between the parties, i.e., whether harmonious or hostile feelings existed . . .; whether they are the natural objects of each other's bounty . . ., and whether they are dealing with each other at arm's length . . .; the type of partnership business, i.e., whether it is one involving certainty or speculation; the nature of the partnership assets, i.e., whether they are stable or fluctuating in value; the probability of a natural increment in the value of its assets; and whether the difference between the book value and the actual value of the contribution is great or small." (191 Cal.App.2d at p. 446.)

The court concluded that because essential factual findings had not been made, those issues would have to be redetermined. Thus neither the estate's nor the Controller's position was sustained.

were *not committed* to a purchase a determination of the adequacy of consideration which might have been paid had such a firm commitment been made at the time the agreement was consummated is not pertinent to any issue confronting us. The "transaction effecting the transfer" was thus the transaction contemplated at Stephen's death by which the shares were eventually exchanged for $100,000. The adequacy of consideration for purposes of section 13641, accordingly, must be measured as of the time of Stephen's death under laws then applicable.[14]

We have, in another context, reached a similar conclusion although it did not constitute a direct holding in that case. In *Estate of Thurston* (1950) 36 Cal.2d 207 [223 P.2d 12], a decedent had conveyed away property in which he had reserved a life estate, a transfer which would subject the property to the tax if the transferor retained the life estate until his death. (See § 13644.) Thereafter he conveyed away his life estate for a valuable and adequate consideration and not in contemplation of death, and it was held that the initial transfer was not taxable. In laying to rest the apprehensions of the Controller that the holding would afford an opportunity to escape the full impact of the inheritance tax by waiting until immediately before death to convey away a retained life estate, we stated: "If the control or interest is retained until the transferor's death, the tax is imposed as if the transferor had remained the owner of the property until his death, and disposition of the property had been through his estate. The testamentary effect of the earlier transfer cannot be altered by a later *testamentary* transfer, either by will or in contemplation of death." (36 Cal.2d at p. 214; italics added.) We note that the retained control or interest of which we spoke in *Thurston* was a lesser control and interest than in the present case and there should, accordingly, be greater reason for levying the tax on the valuation at death.

 There can be little dispute, of course, as to the inadequacy of the consideration in this case. The corporation paid $100,000 for assets worth $454,127. The parties to the agreement were the two brothers and a corporation wholly owned by them. Such an arrangement did not represent an arm's length transaction. The agreement was designed to perpetuate the

[14]*Craycroft* notes, in keeping with our holding here, that where adequate consideration is currently paid or covenanted to be paid for an *inter vivos* transfer firmly committed to take place in possession and enjoyment at the death of the transferor, section 13641 may not be applicable although the property transferred appreciates substantially prior to the transferor's death. Although consideration was paid and there was a firm commitment in that case, there was also reason to believe that at the time of the *inter vivos* transfer the promised consideration was then disproportionate to the real value of the property transferred by Mrs. Craycroft to the partnership. It was the failure to make such determination which compelled reversal in that case.

surviving brother's control of the closed corporation, did not expose either the surviving brother or the corporation to any financial risk and at the same time was fraught with the opportunity not only to fix a purchase price advantageous to the surviving brother but also the value of the stock for tax purposes to which the survivor would succeed. Should the inconstant worth of the stock decline in value, the buy-sell agreement made provision for reevaluation which protected the corporation (and the surviving brother) from overpayment. On the other hand should the stock increase significantly in value without a reevaluation by the brothers, the survivor would gain not only a windfall but also a tax advantage if the consideration agreed upon could be deemed to fix the fair market value. The agreement, whatever its design, thus furnished the brothers an *opportunity* to avoid the hazard of speculating on the fluctuating worth of the shares and to effect a transfer of them at less than adequate and full consideration with the consequent tax advantage. Because the shares very materially increased in value over a 10-year period during which no attempt was made to adjust the consideration to be paid, the brothers must be deemed to have seized that opportunity and it follows that the transfer was without an adequate and full consideration and was donative in character.[15]

Although not pertinent to our present inquiry we note that when an *inter vivos* transfer to take effect in possession and enjoyment at death has been determined to be for less than an adequate and full consideration, *Craycroft* holds that the amount of the tax is to be calculated based on the full value of the property transferred or coming into possession and enjoyment at death without any dimunition for that consideration which had been paid but deemed to be inadequate. This was in keeping with the rule that the tax is to be imposed on "beneficial succession." (See *Estate of Rath, supra,* 10 Cal.2d 399, 405.) Following the relevant dates in *Craycroft,* however, the Legislature amended section 13641 to provide that the value of the transfer subject to the tax shall be decreased by an amount which accounts for such consideration as might have been paid although deemed to be inadequate. (Stats. 1959, ch. 485, § 1, p. 2419.) ■ In the instant case no consideration for the transfer was paid except the $100,000 exchanged at death and the balance of the value of the property as measured at death, in addition to the $100,000 included as an asset of

[15]We recognize that the court made no finding that the brothers entertained any intent at the time they entered into the agreement to diminish the Controller's right to assess for inheritance tax purposes and Paul claims no purposeful wrongdoing. Such an intent or purpose is not necessary in support of a demand for inheritance taxes properly levied on an *inter vivos* transfer. It is sufficient to bring the transfer within section 13641 if the plan or scheme, whatever its subjective intents, results in a transfer which is donative in character. (*Estate of Hyde* (1949) 92 Cal.App.2d 6, 14 [206 P.2d 420].)

the estate, is subject to the tax in accordance with the revised provisions of section 13641.

Cases in which the courts have acknowledged the value of assets as fixed by *inter vivos* agreement to take effect at death, are readily distinguishable. The distinctions are generally based on the failure as in the instant case either to have made an *inter vivos* transfer of consideration at a time when it was adequate and full, or to have provided for a good faith and reasonable *inter vivos* fixing of a formula for determining fair market value. Thus in *Estate of Ferrero* (1956) 142 Cal.App.2d 473 [298 P.2d 604], and *Estate of Foreman* (1969) 269 Cal.App.2d 180 [74 Cal.Rptr. 699], there was not only adequate contract consideration for the making of the buy-sell agreement but the parties had reevaluated the price upward in accordance with the agreement at a time sufficiently close to the time of death to fairly reflect a fair market value. In *Estate of Brix, supra,* 181 Cal. 667, the *inter vivos* grant of an estate in land to take effect on the death of a grantor was held to have been made for adequate consideration actually transferred to the grantor at the time the agreement was made. (See also *Estate of Vai, supra,* 65 Cal.2d 144.)

The order appealed from is affirmed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.