Filed 1/29/15; pub. order 2/27/15 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN MARCOS,<br><br>     Plaintiff, Cross-defendant and Respondent,<br><br>     v.<br><br>LOMA SAN MARCOS, LLC, et al.,<br><br>     Defendants, Cross-complainants and Appellants. | D062628<br><br><br>(Super. Ct. No. 37-2010-00057827-CU-OR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas, III, Judge. Affirmed.

Palmieri, Tyler, Wiener, Wilhelm & Waldron LLP, Charles H. Kanter, Elise M. Kern, Erin K. Oyama and Gregory N. Weiler for Defendants, Cross-complainants and Appellants.

Lounsbery Ferguson Altona & Peak LLP, Helen Holmes Peak, Jacqueline S. Vinaccia, Avnet K. Sidhu, Shawn M. Robinson; Shustak & Partners, P.C., and Jennifer S. Hegemier for Plaintiff, Cross-defendant and Respondent.

Loma San Marcos, LLC, Questhaven Pacific View, LLC, and La Paz Sunset, Inc. (collectively Loma San Marcos) purchased a 15-acre property subject to a security and lien agreement with the City of San Marcos (City). The agreement was entered into by the property's former owner to securitize fees due pursuant to a conditional use permit that allowed the owners to convert the property from a recycling facility to a movie studio. Under the agreement the property owner was obligated to pay the City impact mitigation fees by dates certain. After purchasing the property and negotiating an amendment to the agreement extending the payment deadlines, Loma San Marcos failed to pay the fees. As a result and based on other terms of the agreement, the City brought this judicial foreclosure action. After trial, the court entered judgment in favor of the City.

Loma San Marcos appeals, contending the fees are not due because (1) the City has yet to issue permits; (2) the renegotiated agreement is unenforceable because it is not supported by valid consideration; and (3) even if otherwise otherwise enforceable, the fees set in the agreement are illegal under the Mitigation Fee Act (Gov. Code, § 66000 et seq.)[1] and the takings clause of the Fifth Amendment to the United States Constitution. We reject these arguments and conclude Loma San Marcos, represented by sophisticated real estate investors, entered a binding agreement with the City to pay the fees at issue or face foreclosure of the property. We affirm the judgment.

---

[1]     All statutory references are to the Government Code unless otherwise noted.

FACTUAL AND PROCEDURAL BACKGROUND

Loma San Marcos purchased the property at issue, located at 1601 San Elijo Road in San Marcos, from San Marcos North County Recourse Recovery Facility, Inc. (NCRRF) in 2005. NCRRF used the property as a recycling facility until June 1995. Thereafter the property sat vacant. NCRRF eventually entered into an agreement to sell the property to another entity that wanted to use it as movie studio. On June 25, 2003, NCRRF applied for a conditional use permit to entitle the property for this new use. On April 13, 2004, the city council approved Conditional Use Permit No. 03-596 (CUP) and Amended Special Plan 03-41, authorizing the new use.

Among other restrictions, the CUP was conditioned on NCRRF's agreement to pay public facility fees "in accordance with the latest adopted ordinance and resolution determined for the project" and to pay a fair share contribution towards improvements to roadways and public infrastructure off-site. To satisfy these conditions, and effective the same day as the CUP, NCRRF and the City entered into a "Real Property Security and Lien Agreement Regarding Mitigation Payments for Project Impacts and Consent to Annex into CFD 98-01, CFD 2001-01 and [CFD] 98-02" (Agreement). The Agreement was recorded with the county on June 14, 2004. It contemplated the sale of the property to "Alliance Holdings, L.L.C. ([also known as] San Marcos Studios) or another Buyer that will develop and operate the Property as an entertainment production facility pursuant to [a] separate agreement between [NCRRF] and such Buyer . . . ." The Agreement set forth three phases of development: Phase 1(a) consisted "of use of up to 100,000 square feet of the existing recycling structure for office use, marketing of the

3

site, and temporary use of small sound stages for commercials and limited film productions"; phase 1(b) consisted "of permanent use of the site for large film production which will require construction of permanent production facilities"; and phase 2 was to "consist[] of construction of [an] office complex, to include [a] parking structure."

In accordance with the conditions of the CUP, the Agreement obligated NCRRF to pay the City a street improvement fair share payment of $1.116 million to mitigate impacts for improvements required on two adjacent roads and a public facility fee (PFF) of $1,238,198.[2] Both fees were to be paid on a schedule based on the three phases of the property's development. $234,000 of the street improvement payment and $365,579 of the PFF was due "upon use or occupancy of Phase 1(a), but in any event not later than December 31, 2006." A second installment of each fee in equal amounts to the first installment was due "upon the earliest to occur of the following: (i) issuance of the first building permit for Phase 1(b); (ii) December 31, 2006; or (iii) use or occupancy of the site for large production film operations (other than small commercials or limited film production)." Finally, the third and final installment of each fee was due "upon the issuance of the first building permit for Phase 2."

In the event the property had not been sold by December 31, 2006, either NCRRF or the City could terminate the Agreement and NCRRF was not liable for the fees. The

_____

[2]      Typically, the City assessed public facility fees by referencing a set formula in its Public Facilities Financing Plan (PFFP). However, as discussed in greater detail in sections III.C and III.D, because "film studio" was not a use identified in the PFFP, a traffic generation report commissioned by NCRRF and prepared by Crain & Associates (the Crain report) was used to arrive at the appropriate fees.

4

Agreement stated its term was 60 months, but also that the Agreement would terminate earlier if the owner failed to comply with its terms or satisfy its obligations. Another provision stated "[u]pon the occurrence of any breach justifying the termination of the Agreement including, but not limited to, . . . failure to timely pay development fees, Road Improvement Payments, PFF, [or] impact fees . . . [the] City shall have the right to issue a notice of termination to Owner . . . ." If the owner failed to remedy the breach within 10 days, the owner would "have no further right or entitlement to the use permitted by CUP 03-596" pending modification of the CUP.

The issuance of a notice of termination gave the City the "right to undertake any action necessary" to secure compliance with the notice. Any costs related to enforcing the notice would be included with any unpaid fees owed under the Agreement to "constitute an obligation running with the Property" and until reimbursed in full would "constitute a lien against the Property." The Agreement also contained an acceleration provision, which stated that the owner's failure to comply with the terms of the Agreement also gave the City the option to demand "[i]mmediate and full compliance with all requirements of CUP 03-596, including but not limited to, the acceleration of all payment obligations set forth in [the] Agreement, such that each such obligation is immediately due and payable by Owner." The clause also provided that the acceleration of payment obligations was "in addition to the remedy of termination" and that the City could "pursue any and all of its remedies, cumulatively and collectively."

The original entity interested in purchasing the property backed out. On February 25, 2005, however, NCRRF sold the property to Questhaven Pacific View, LLC (owned

5

by John Baldwin) and La Paz Sunset, Inc. (owned by Conrad Prebys) for $8.75 million. In May 2006 these entities sold 72 percent of their interest in the property to Loma San Marcos, LLC (owned by Allan Kuebler) for $9 million. Before the purchase, each buyer reviewed a title report for the property disclosing the existence of both the CUP and the Agreement. After Loma San Marcos, LLC purchased its interest, Kuebler, on behalf of Loma San Marcos, LLC, entered into an addendum to the Agreement with the City to extend the December 31, 2006 payment deadline so it could have additional time to negotiate amendments to the Agreement. Specifically, the addendum stated Loma San Marcos, LLC "wishes to modify certain of the time periods set forth in [the Agreement] executed by and between the City and NCRRF and recorded in the San Diego County Recorder's Office . . . ." The addendum extended the deadlines by which NCRRF was to have paid the impact mitigation fees and the Agreement's termination date from December 31, 2006 to March 1, 2007.

On February 28, 2007, Loma San Marcos, LLC and the City entered the "Amended and Restated Real Property Security and Lien Agreement Regarding Mitigation Payments for Project Impacts and Consent to Annex Into CFD 98-01, CFD 2001-01 and [CFD] 98-02" (Amended Agreement). The Amended Agreement was substantially the same as the original Agreement. It required the same total mitigation fees, but set a new payment schedule. The Amended Agreement provided the street improvement fair share payment and PFF associated with phases 1(a) and 1(b), totaling $1,199,158, would be paid according to an "automatic disbursement procedure and payment schedule." The payments would commence on March 1, 2007, with the first

6

payment due September 1, 2007, and "the entire amount paid over a 12 month period at 6% interest accrued on the unpaid balance." The payments associated with phase 2 were due "upon the issuance of the first building permit for phase 2 or any interim use not requiring a building permit." The Amended Agreement provided that if the phase 2 building permit was not issued within five years, the PFF would be reassessed "based upon the public facility fees in effect at time of issuance of the first building permit for Phase 2."

The Amended Agreement contained the same payment acceleration clause as the original Agreement. If Loma San Marcos failed to comply with the Amended Agreement's terms, the City had the right to demand, and Loma San Marcos "the obligation to provide, immediate and full compliance with all requirements of CUP 03-596, including but not limited to, the acceleration of all payment obligations set forth in" the Amended Agreement, "such that each such obligation is immediately due and payable . . . ." Like the original Agreement, the amended version operated as a lien and was recorded with the San Diego County Recorder's Office as an encumbrance on the property.

After the Amended Agreement was recorded, the property development continued to falter and the property primarily sat vacant. It was used for a commercial car photo shoot and rented as storage space several times.[3] Loma San Marcos failed to meet its payment obligations under the Amended Agreement, but the City permitted the interim

---

[3] At some point Loma San Marcos leased the property to John Bailey, who worked with Kuebler and the City to extend the deadlines in the original Agreement.

uses to generate interest in the property and assist Loma San Marcos in generating income to make payments. On October 27, 2009, after several attempts to get Loma San Marcos to satisfy its payment obligations, the City sent a letter to Loma San Marcos demanding performance of "its obligations under the Amended Agreement" to pay "$2,390,625.00, plus interest accrued on the Phase 1 obligations from and after 1 August 2008, the dedication of required rights-of-way, construction of intersection improvements pursuant to plans to be approved by the City and annexation into the City's CFDs" by November 20, 2009. Loma San Marcus took no action to satisfy its obligations in response to the demand.

On February 18, 2010, the City sent Loma San Marcos a notice of termination pursuant to the Amended Agreement. The notice described Loma San Marcos's overdue obligations, including payment of the total amount of impact mitigation fees pursuant to the agreement's acceleration clause, and indicated that if the obligations were not satisfied within 10 days the City would revoke Loma San Marcos's entitlement to the use permitted by the CUP, as well as pursue litigation to secure compliance with the notice. In August 2010, the City filed its complaint against Loma San Marcos in judicial foreclosure. Loma San Marcos cross-complained, seeking rescission of the Amended Agreement on the grounds the fees were illegal or the existence of a mutual mistake of material fact because the use permitted was not viable.

The five-day bench trial began on March 2, 2012. In addition to documentary evidence, the court heard the testimony of the city manager; the city's development director, who among others worked with Loma San Marcos on the Amended Agreement;

8

a deputy city manager; the principal owners of the Loma San Marcos entities; the NCRRF representative who worked with the City on the original Agreement and entitlements; and experts for both sides on the amount of impact mitigation fees at issue.[4] On July 12, 2012, after both sides submitted their closing briefs, the trial court issued its statement of decision in favor of the City.

The court concluded the "parties willingly entered into the Amended and Restated Real Property Security and Lien Agreement in February of 2007 . . . , that the Amended Agreement is enforceable, and that the Defendants have no right to Rescission." The court found that Loma San Marcos breached the Amended Agreement by not making the first payment, triggering the agreement's acceleration clause and its obligation to pay the entire street improvement fair share payment and the PFF related to phases 1(a) and 1(b) of the project. The court found the agreement ambiguous as to the obligation to pay the portion of the PFF associated with phase 2 of the project because it contemplated deferment of the development of that piece of the project.

The court rejected Loma San Marcos's request for rescission on the ground that it was in default of the Amended Agreement. The court further found that even if Loma San Marcos had not been in default, it failed to show a material mistake of fact or law that would give rise to a right to rescission. The court also rejected Loma San Marcos's argument the fees were illegal under the Mitigation Fee Act, finding the City proved a reasonable relationship between the fees imposed, the need for public facilities funded by

---

4     Loma San Marcos stipulated at trial that its principals "were sophisticated purchasers . . . involved in numerous real estate transactions in the past."

the fees and the amount of public facility needs that could be attributed to the studio project.

DISCUSSION

I.  STANDARD OF REVIEW

Loma San Marcos contends the facts are essentially undisputed and, therefore, its appeal is subject to a de novo standard of review.  The City asserts the trial court's determination that its assessment of the fees did not violate the Mitigation Fee Act is governed by the substantial evidence standard of review.

With respect to the interpretation of the Amended Agreement, this court is not bound by the trial court's interpretation.  The de novo standard of review applies where the trial court's interpretation is "'based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].'" (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.)  The trial court's determination, however, that the CUP was valid at the time the Amended Agreement was entered is a factual finding subject to the substantial evidence standard of review.  (See, e.g., *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1052-1053 [waiver of permitting decision within six months under the Permit Streamlining Act (§ 65920 et seq.) is a question of fact subject to substantial evidence review].)

The trial court is limited in its review of the City's assessment of mitigation fees, and this court's review of the trial court's determination is de novo.  Assessment of mitigation fees is a quasi-legislative action.  The authority of the trial court is, therefore,

10

"limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786.)

"Courts exercise such limited review out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority. [Citation.] However, the agency must act within the scope of its delegated authority, employ fair procedures, and be reasonable. 'A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.] Nevertheless, in technical matters requiring the assistance of experts and the study of scientific data, courts will permit agencies to work out their problems with as little judicial interference as possible. [Citation.] [¶] The appellate court reviews the trial court's decision de novo under the same standard." (*California Building Industry Assn. v. San Joaquin Valley Air Pollution Control Dist.* (2009) 178 Cal.App.4th 120, 129-130.)

## II. ENFORCEABILITY OF THE AMENDED AGREEMENT

Loma San Marcos contends the court erroneously interpreted the Amended Agreement. It argues the agreement cannot supersede the CUP, which "expressly provides . . . that [building] fees are not due until building permits are issued." Similarly, it asserts the acceleration provision of the agreement is unenforceable because it contradicts the CUP. Loma San Marcos also contends the CUP was invalid at the time

11

the Amended Agreement was executed and, therefore, insufficient consideration supported the contract.[5]

## A

Loma San Marcos argues the CUP provides that fees are not due until building permits are issued and that the Amended Agreement's requirement that the fees be paid prior to the issuance of permits cannot supersede the CUP. We do not agree that the language of the CUP prevented the parties from agreeing to pay the negotiated fees before the issuance of permits. The CUP did not prevent Loma San Marcos, or its predecessor, from entering an agreement to alter the timing of paying the impact mitigation fees. Indeed, the CUP contemplates the early payment of the fees.

The CUP outlines specific conditions that must be satisfied at various times. Some conditions must be satisfied before the CUP can be relied on for the new use, others before the issuance of grading permits and building permits, others must be complied with during construction, and still others must be satisfied before the property is occupied. With respect to the impact mitigation fees, the CUP provides "[t]his project is subject to payment of the public facility fee established by the City of San Marcos. The amount of the fee shall be in accordance with the latest adopted ordinance and resolution determined for the project." Similarly, the CUP requires the applicant/developer to

---

[5] Loma San Marcos also asserts that to the extent there is any ambiguity in the agreement, it should be construed against the City as the drafting party. We do not find ambiguity and, therefore, need not apply this principle.

"make a fair share contribution towards improvements to the San Elijo Road along the project frontage" before the issuance of any building permit.

To effectuate the CUP, NCRRF negotiated and entered into the original Agreement setting forth the specific terms for the payment of the two fees, including the amount and timing of the payment. After purchasing the property with knowledge of the terms of the Agreement and their applicability to the new owner, Loma San Marcos entered into the Amended Agreement, explicitly agreeing to the amount of the fees and negotiating a favorable modification of the original Agreement's terms that extended the deadline for payment and spread the payment over additional installments.

Loma San Marcos points to no language in the CUP that limits the time for payment of the fair share contribution or the PFF until after a permit is issued, or that prevents the fee conditions from being satisfied in accordance with a separate agreement. To the contrary, the CUP states the fee is to be set in accordance with the PFF Ordinance. The PFF Ordinance and the PPF Plan adopted thereunder contemplate the payment of fees prior to the issuance of building permits. The PFF Plan states "[e]xcept as otherwise provided by law, no building permit or occupancy permit for any development project shall be issued, and no person shall build, use, redevelop or occupy any project without first paying the fee established by this Ordinance, or otherwise complying with the provisions of this Ordinance." Loma San Marcos's counsel conceded during trial that "the developer can pay fees at a time other than pulling the permit." Given these undisputed facts, we agree with the trial court's conclusion that the CUP did not prevent

13

the enforcement of the Amended Agreement's terms requiring payment of the PFF and fair share fees in advance of permits being issued.

We also reject Loma San Marcos's contention that the acceleration clause of the Amended Agreement could not be applied to the impact mitigation fees. As discussed, *ante*, the CUP did not preclude Loma San Marcos from agreeing to pay the fees prior to the issuance of building permits. The acceleration provision stated that the City had, "as its sole option, [] the right to demand, and the Owner shall have the obligation to provide, immediate and full compliance with all requirements of [the CUP], including but not limited to, the acceleration of all payment obligations set forth in [the Amended] Agreement." The language is clear that the impact mitigation fees, which are the "payment obligations set forth in [the Amended] Agreement" are subject to acceleration.

B

As it did in the trial court, Loma San Marcos argues there was no valid consideration because the CUP expired before it entered the Amended Agreement. Sufficient, or good, consideration is an essential element to the existence of a contract. (Civ. Code, § 1550.) "Good consideration" is "[any benefit conferred, or agreed to be conferred, upon the promisor" or "prejudice suffered, or agreed to be suffered" by the promissee. (Civ. Code, § 1605.) "[B]argained-for contractual consideration is not required to be adequate in the sense of equality in value but only need represent some legal detriment not otherwise incurred." (*Estate of Bielec* (1972) 8 Cal.3d 213, 222; *A. J. Industries, Inc. v. Ver Halen* (1977) 75 Cal.App.3d 751, 761.) The trial court's determination regarding the validity of the CUP was a factual finding based on the

14

evidence presented at trial and is reviewed under the substantial evidence standard. (See *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [The trial court's resolution of disputed factual issues must be affirmed so long as supported by substantial evidence.].)

The trial court found that under the Amended Agreement the City gave up its right to collect PFF at future higher rates and that the "monies were to be paid by the Defendants in exchange for the ability to immediately begin film production in the existing buildings." The trial court concluded the detriment to the City and the benefits conferred on Loma San Marcos were adequate consideration for Loma San Marco's agreement to pay the PFF and mitigation fees. Loma San Marcos asserts this finding was erroneous because the CUP had expired prior to the execution of the Amended Agreement. According to Loma San Marcos, because the CUP was expired the City had the right to assess a higher PFF and consideration was lacking.

Substantial evidence supported the court's finding that the CUP remained valid when the parties executed the Amended Agreement. Section P of the CUP states that "[t]his Conditional Use Permit shall become null and void if not acted upon within twelve (12) months of the adoption of this resolution." However, City Manager R. W. Gittings provided Loma San Marcos with written assurance in January 2006 that the CUP remained in force and would remain valid "through the earlier of November 6, 2006 or the date upon which all parties with a legal interest in the decision have accepted landfill closure as complete." (Italics omitted.) At trial, the City's principal planner, Garth Koller, also explained that if the owner wanted to extend the expiration of the CUP it

15

could seek approval from the City's planning commission, which would likely approve any extension requested. An extension of the CUP did not require the city council's approval.

Loma San Marcos bases its argument that the CUP had expired on the contradictory trial testimony of Koller who also stated, after reading section P of the CUP on the stand, that the CUP "would have [expired] 12 months from the date of April 13, 2004." While Koller's statement could be understood to support Loma San Marcos's claim the CUP had expired, the letter from Gittings assuring Loma San Marcos the CUP was valid and Koller's additional testimony that, even if it had expired, reinstating the CUP was pro forma sufficiently supported the court's finding the CUP remained valid. Further, as the trial court pointed out, evidence of the "the parties' conduct showed that [Loma San Marcos was], at all relevant times, entitled to use the property as a film studio." The trial court's conclusion the CUP remained valid at the time the Amended Agreement was entered was supported by substantial evidence. We, therefore, reject Loma San Marcos's contention there was no valid consideration for the Amended Agreement.

In the statement of facts in its opening brief, Loma San Marcos asserts the City never disclosed the payment of prior impact mitigation fees related to the recycling facility. At trial, Loma San Marcos argued this was a material mistake of fact that supported rescission of the Amended Agreement. Loma San Marcos does not assert any legal argument in its briefing on this appeal based on material mistake of fact. The issue was raised by counsel for Loma San Marcos at oral argument. We agree with the trial

16

court that Loma San Marcos, represented by sophisticated real estate investors, was required before entering the agreement "to review the grounds for the imposition of the fees" and "cannot now rescind the Amended Agreement simply because [it] now, in hindsight, believe[s it] may have made a mistake as to the sufficiency of [its] knowledge and due diligence efforts at the time [it] purchased the property, at the time [it] executed the Addendum to the Agreement, or at the time [it] executed the Amended Agreement."

### III.  LOMA SAN MARCOS'S CLAIMS UNDER THE MITIGATION FEE ACT AND TAKINGS CLAUSE

#### A

Loma San Marcos contends the amount of impact mitigation fees it agreed to pay violates the Mitigation Fee Act.  Specifically, Loma San Marcos contends that the City (1) failed to demonstrate a reasonable relationship between the fees and the type of development and (2) failed to use a valid method to assess the fees.  Similarly, it argues the fees are unconstitutional under the takings clause because the City (1) cannot show a nexus between its interests and the permit fees and (2) cannot show rough proportionality between the public impact of the land use change and the fees.  Underlying these claims is Loma San Marcos's contention that the fees failed to take into consideration impact fees paid by prior owners of the property and that the method used by the City to determine the amount of the fees was improper.

The Mitigation Fee Act "sets forth procedures for protesting the imposition of fees and other monetary exactions imposed on a development by a local agency."  (*Erlich v. City of Culver City* (1996) 12 Cal.4th 854, 864.)  The "Act was passed by the Legislature

17

'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.'" (*Ibid.*) Section 66001, subdivision (a) provides that "[i]n any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency, the local agency shall do all of the following: [¶] (1) Identify the purpose of the fee. [¶] (2) Identify the use to which the fee is to be put. . . . [¶] (3) Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed. [¶] (4) Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed."

The Mitigation Fee Act also requires the local agency imposing the fee to provide the project applicant with "notice in writing at the time of the approval of the project or at the time of the imposition of the fees, dedications, reservations, or other exactions; a statement of the amount of the fees or a description of the dedications, reservations, or other exactions; and notification that the 90-day approval period in which the applicant may protest has begun." (§ 66020, subd. (d)(1).) The Act requires a party challenging the imposition of the fee to tender "any required payment in full or provide[] satisfactory evidence of arrangements to pay the fee when due." (§ 66020, subd. (a)(1).)

The takings clause requires "rough proportionality" between conditions imposed on the development of property, including mitigation fees, and the impact the condition is meant to mitigate. (*Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 229-230) To satisfy this standard, "[n]o precise

18

mathematical calculation is required, but the city must make some sort of individualized determination that the [mitigation fees are] related both in nature and extent to the impact of the proposed development." (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 391.)

If a fee subject to the Mitigation Fee Act "is challenged, the local agency has the burden of producing evidence in support of its determination. [Citation.] The local agency must show that a valid method was used for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development." (*Homebuilders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 561.) The "burden of producing evidence is not equivalent to the burden of proof." (*Id.* at p. 562.) Rather, while the "agency has the obligation to produce evidence sufficient to avoid a ruling against it on the issue" (*ibid.*), the party "challenging an impact fee has to show that the record before the local agency clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the development." (*Ibid.*)

"Accordingly, the local agency has the initial burden of producing evidence sufficient to demonstrate that it used a valid method for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development. If the local agency does not produce evidence sufficient to avoid a ruling against it on the validity of the fee, the [party] challenging the fee will prevail. However, if the local agency's evidence is sufficient, the [challenging party] must establish a requisite degree of belief in the mind of the trier of fact or the court that the fee is invalid, e.g., that the fee's use and the need for the public facility are not reasonably

19

related to the development project on which the fee is imposed or the amount of the fee bears no reasonable relationship to the cost of the public facility attributable to the development." (*Homebuilders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore*, *supra*, 185 Cal.App.4th at p. 562.)

B

As an initial matter, the City asserts Loma San Marcos's challenge to the fees was untimely and it waived its right to such a challenge. The trial court found the "[d]efendants and their predecessors chose not to challenge the fees and entered into three (3) agreements to memorialize their agreement to pay." Loma San Marcos now asserts their challenge is valid because the City did not provide the notice required by the Mitigation Fee Act. In support of this assertion, it points to the trial testimony of City Manager Paul Malone and Developmental Services Director Charlie Schaffer. Loma San Marcos contends Malone "conceded that the City's [notice] did not comply with the statutory notice requirements of the Mitigation Fee Act" and that Schaffer could not recall whether written notice of the right to challenge the fees was provided.

The record, however, shows that on April 20, 2004, the City provided NCRRF with notice of the city council's approval of the CUP and its right to challenge. The back of the notice states that "[a]ny petition or other paper seeking judicial review must be filed in the appropriate court not later than the 90th day following the date on which [the] decision becomes final." In addition, and more importantly, NCRRF negotiated and agreed to the fees by entering the original Agreement. By so doing, NCRRF waived its right to challenge the fee conditions. (See *Rossco Holdings, Inc. v. State of California*

20

(1989) 212 Cal.App.3d 642, 654 ["A landowner cannot challenge a condition imposed upon the granting of a permit after acquiescence in the condition by either specifically agreeing to the condition or failing to challenge its validity, and accepting the benefits afforded by the permit."].)

Loma San Marcos then purchased the property subject to that Agreement and reaffirmed its own agreement to pay the impact mitigation fees by entering the Amended Agreement. By purchasing the property subject to the conditions imposed by the CUP and original Agreement, Loma San Marcos "waived . . . any right to a property interest greater than that conveyed by [its] predecessor[] in interest." (*Ojavan Investors, Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 528.) Loma San Marcos's execution of the Amended Agreement reaffirmed that waiver. In light of these undisputed facts, Loma San Marcos did not have a right to challenge the fees under the Mitigation Fee Act or the takings clause.[6] (*Ojavan Investors, supra*, at p. 527.)

C

Even if we assume Loma San Marcos may challenge the fees, we agree with the trial court that the payment of impact mitigation fees by prior owners of the property when it was entitled as a recycling facility did not render the agreed fees for the

---

[6] In its reply, Loma San Marcos contends the case is not ripe because the fees are not due until after a full hearing and ruling on its challenge of the fees. We decline to consider this argument raised for the first time in the reply brief. (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 171.) We note, however, that section 66020, which Loma San Marcos cites in support of its argument, requires the party challenging fees assessed by an agency to tender payment in order to proceed with a challenge. (§ 66020, subd. (a)(1).)

entitlement of the property as a film studio invalid. The City met its burden to show there was a reasonable relationship between the impacts that were projected from the new development and the public facilities financed in the PFF plan and the street improvement fair share payments. The City also adequately showed a rough proportionality between the public impact of the land use change and the fees.

The purpose of the PFF was to mitigate the cost of public facilities related to the development project and, under the CUP, the amount was to be "in accordance with the latest adopted ordinance and resolution determined for the project." The fair share contribution fee was payment for "improvements to roadways, including the widening of the public access road from two lanes to four lanes and public infrastructure off-site." As set forth in the CUP, the basis for the amount of the PFF was determined according to the City's PFF Plan, adopted through City Ordinance 2003-1203 (PFF Ordinance). The plan states that "[e]xcept as otherwise provided by law, no building permit or occupancy permit for any development project shall be issued, and no person shall build, use, redevelop or occupy any project without first paying the fee established by this Ordinance, or otherwise complying with the provisions of this Ordinance."

The PFF Ordinance establishes a reasonable relationship between the impacts to the City's existing public facilities caused by new development and the amount of fees imposed on that development to compensate for those impacts. The PFF Ordinance also confirms new development does not fund deficiencies in current public facilities. Section 3 of the PFF Ordinance states the fees assessed thereunder are calculated to be equal to or less than the cost of the improvements and shall be paid prior to the issuance of a

22

building permit. Indeed, Loma San Marcos does not challenge the method of calculation set forth by the PFF Ordinance.

Instead, Loma San Marcos argues the amounts of the PFF and the fair share payments are not reasonably related to the public facilities they are meant to finance because mitigation fees paid in 1988 and 1992 when the property was permitted as a recycling facility were not deducted. We do not agree with this contention. Loma San Marcos's own expert, Albert Torma, conceded at trial that prior mitigation payments could not be aligned with the prospective impacts to be mitigated by the PFF and fair share payments contained in the Amended Agreement. Torma also testified the industry standard was to disregard a previous use when a property was vacant for more than one year. In this case, the property had not been used as a recycling facility since 1995, at least eight years before NCRRF submitted its application for the CUP. While Loma San Marcos asserts the City wrongfully failed to "consider the traffic already generated by the recycling center," given the relatively long period of vacancy, the City's position that no traffic was being generated by the prior use at the time the fees were determined was reasonable.

The case on which Loma San Marcos relies, *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840 (*Warmington*), also does not persuade us that mitigation payments made in 1988 and 1992 should have offset the fees at issue here. In *Warmington*, a developer demolished 56 apartment units and replaced them with 36 single family homes. (*Id.* at p. 846.) The local school district imposed school-impact fees of $122,080.22 on the project and the developer challenged the fees

23

under the Mitigation Fee Act on the grounds there was an "insufficient 'nexus between the impact of the new residential units in terms of student generation and the facility fees' imposed." (*Warmington*, at p. 846.) The Court of Appeal agreed, concluding the fee study on which the school district relied to determine the amount of fees did not support a finding there was a reasonable relationship between the need for the public facility and the type of development project on which the fee was imposed. In *Warmington,* the study that the district relied on considered the costs associated with new residential construction, not redevelopment construction that replaced existing residences and *reduced* the number of potential students. (*Id.* at p. 862.)

The impact mitigation fees were improper because the project actually decreased population density, reducing impacts to the school district. In contrast here, at the time the PFF and fair share payments were determined, the property had sat vacant for more than eight years. The impact mitigation fees paid by the owners of the recycling center were used to offset earlier impacts created by that facility and properly assessed to its developers under prior iterations of the PFF Ordinance and Plan.[7] Those prior payments

_____

[7]     *Cresta Bella, LP v. Poway Unified School Dist.* (2013) 218 Cal.App.4th 438 (*Cresta Bella*), cited by Loma San Marcos, is distinguishable from this case on the same basis. Like *Warmington*, the court in *Cresta Bella* invalidated school-impact fees where the school district failed to show any prospective increase in student population as a result of residential redevelopment. (*Id.* at p. 445.)

     We also do not agree with Loma San Marcos that the fees assessed in this case are like those invalidated in *Erlich, supra,* 12 Cal.4th 854. In *Erlich*, the court concluded there was no rough proportionality between a $280,000 mitigation fee imposed by the city on the owner of a private recreational facility. The city assessed the fee in connection with permitting a change to a nonrecreational use to compensate it for the loss of much needed recreational space. The *Erlich* court concluded the fee was

did not offset the prospective impacts of the new use mitigated by the fees set by the Amended (and original) Agreement. The payment of impact fees by the prior owners in this case did not warrant an offset of the mitigation fees assessed for the new use.

D

In addition to its contention that the impact mitigation fees were improper because they did not take into consideration payments by the property's prior owners, Loma San Marcos argues the method used by the City to determine the PFF violated the Mitigation Fee Act because: (1) the Crain Study used "major movie studios in Los Angeles County" as the basis for determining the traffic that would be generated by the San Marcos studio and the traffic generated by studios in Los Angeles is not "reasonably comparable" to the traffic that would be "generated by smaller and lesser known movie studios in San Diego County;" and (2) the City should not have used a land use that was "approximately 'the same'" as the movie studios use to calculate the fees. According to Loma San Marcos, these flaws show the lack of a reasonable relationship between the PFF imposed and the burden to the City created by the project.

We do not agree the methods used to set the PFF fees ran afoul of the requirements of the Mitigation Fee Act or the rough proportionality requirement of the takings clause. As the basis for determining the PFF, NCRRF commissioned the Crain report to determine what amount of traffic would be generated by the new development.

disproportionate to the extent of the impact because it required the owner to pay for public recreations facilities, when what was being lost was private, commercial recreational facilities. (*Id*. at p. 883.) In this case, the amount of fees assessed by the City for the development of the movie studio was proportionate to the projected impacts of the project.

25

Because the existing publication used in the industry as the basis for the "traffic-generating characteristics of various land uses for San Diego County" did not include "standardized rates and equations for entertainment production studios," the Crain report looked to the Burbank Media District Specific Plan (MDSP) to determine the potential traffic generation of the project. According to the Crain report, the City of Burbank, home to large entertainment studios and small production and post-production facilities, adopted the MDSP in 1991 to "standardize trip generation estimation methodologies for these types of developments."

The Crain report explains the MDSP "establishe[s] a series of adjustment factors, called 'Office Equivalency Factors' [OEF] to convert the floor area of various [entertainment industry] land uses to equivalently-sized commercial office buildings, for which detailed and extensive trip generation data is available." The OEF for each of the four uses the Crain report includes (sound stage, media workshop, media office and warehouse/storage) show the traffic generated by these uses is less than that generated by commercial office buildings.[8]

As discussed, Loma San Marcos complains that because "traffic generated by major movie studios, such as Warner Brothers and Disney, in Los Angeles County cannot be deemed reasonably comparable to traffic generated by smaller and lesser known movie studios in San Diego County" the City failed to demonstrate "it relied on a valid

---

[8] The OEF set by the MDSP for a sound stage is 6.34, so that the impact created by a 1,000 square foot sound stage is equivalent to the impact created by 157.7 square feet of commercial office space. The OEF for a media workshop is 9.6, the OEF for media office use is 1.33, and the OEF for warehouse/storage space is 24.12.

methodology or a reasoned analysis to establish a reasonable relationship between the fees it imposed and the burden of the project." The Crain report, however, does not suggest its projections were arrived at by using the "traffic generated by major movie studios." Rather, it relies on the office equivalency factors set forth in the MDSP to determine what the equivalent square footage of "general office" space is for each type of entertainment use (e.g., sound stage, production support, tenant lease space . . . ) proposed for the property.[9] The Crain report indicates the MDSP is based not only on large studio facilities, but also encompasses impacts created by smaller production facilities. We see nothing invalid in the methodology used by the Crain report to arrive at the office equivalency factors used to determine the potential impacts of the project.

Loma San Marcos also complains that the projected traffic numbers contained in the Crain report were based on an "improper comparative method to identify a land use with 'approximately' the same traffic generation" as the San Marcos studio project. Loma San Marcos, however, does not explain why it believes the office equivalency factors set forth in the MDSP and used in the Crain report are an "improper comparative method." Again, we see no impropriety in the methodology that was used to generate traffic projections, which by their nature are approximations. (See *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 235 [Because the process of estimating

---

9      Rather than use the "general office" category in the Institute of Transportation Engineers (ITE) Trip Generation publication that is suggested by the MDSP, at the recommendation of the City, the Crain report used trip generation data from a publication of the San Diego Association of Governments. That publication does not contain "general office" use trip rates, but instead contains rates for "office park," which the Crain report indicates "are generally equivalent to the ITE General Office rates."

growth to determine development fees "necessarily involve[s] predictions regarding population trends and future building costs, it is not to be expected that the figures will be exact."].)  We agree with the trial court's finding the PFF did not violate the Mitigation Fee Act, and conclude the PFF was arrived at using "a reasoned analysis designed to establish the requisite connection between the amount of the fee imposed and the burden created."  (*Shapell Industries, Inc.,* at p. 235.)

DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

28

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

CITY OF SAN MARCOS,
Plaintiff, Cross-defendant and Respondent,
v.
LOMA SAN MARCOS, LLC et al.,
Defendants, Cross-complainants and Appellants.
**D062628**
**San Diego County No. 37-2010-00057827-CU-OR-NC**

THE COURT:

The opinion in this case filed January 29, 2015 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the respondent's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

BENKE, Acting P. J.

Copies to:  All parties